24 C.C.P.A.(Patents)

### In re MILLER.*

#### Patent Appeal No. 3703.

Court of Customs and Patent Appeals.
Dec. 7, 1936.

Gerald G. Barry, of Chicago, Ill., for appellant.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office, affirming a decision of the examiner rejecting claims 1 to 8, inclusive, and 13 to 16, inclusive, of appellant's application for patent, upon the ground that the same are not patentable in view of the cited prior art.

*Appellant's petition for rehearing denied.

Claims 3 and 14 are illustrative and read as follows:

"3. In the process of manufacture herein described, the steps comprising introducing roasted coffee beans into water, then cooking with Cognac brandy, or the like, in such a manner that the deleterious portion of alcohol is released as a gas (but not other alcoholic constituents), and removed from the mass, then separating the roasted coffee beans, and withdrawing a water soluble extract composed of the cooked brandy and coffee solutions, substantially as described."

"14. A composition of alcohol and coffee, substantially as set forth."

The references relied upon are:

Collingridge et al. (British), 1,573, of 1878.

Meyer (British), 6,453, of 1900.

Page 196 of "Beasley's 3,000 Prescriptions."

Pages 181, 182, 163, of "Manual of Beverages" by Hiss.

The alleged invention is concisely described in the statement of the examiner as follows:

"The alleged invention resides in a medicinal composition in the form of a beverage to be used as a tonic and stimulant. In preparing the composition, freshly roasted coffee is extracted with hot water. To this coffee extract there is added a quantity of Cognac brandy, alcohol, or the like and the mixture is heated to a temperature below 175 degrees Fahrenheit in a vessel equipped with a water-cooled condenser for a period of 15 to 30 minutes, then cooled and bottled. The specification is not clear as to the relative proportions of coffee extract and alcohol used, but it is stated that when the mixture is to be added to other alcoholic liquids the coffee extract of the cooked preparation should be in excess of the alcoholic content of the Cognac or other brandy used in it. The end of the condenser is left open to the air and applicant states that from this opening during the cooking there evolves a 'reek of very poisonous gas and condensate which should not be put back or allowed to get back into the preparation.' The composition is to be used by itself or is to be mixed with other alcoholic beverages or may even be added to laxative oils such as castor oils. When added to alcoholic beverages or when used alone for its alcoholic stimulating effects the main object is to afford the patient or user the full stimulating effects of the alcohol without the intoxicating effects. A larger quantity of alcohol may therefore be consumed without the user becoming intoxicated."

The patent to Collingridge et al. shows a composition "of a nontoxicant and potable character" made by digesting tea leaves or roasted coffee berries with alcohol and water in a vessel at a temperature of 90 to 100 degrees Fahrenheit.

Page 163 of the Manual of Beverages contains the following formula:

"III.

| | |
|---|---|
| "Coffee, freshly roasted and ground..... | av. oz. 16 |
| "Sugar ................................ | av. oz. 48 |
| "Brandy, best French.................... | fl. oz. 2 |
| "Water, boiling.......................... | sufficient |

"Moisten the coffee with some hot water mixed with the brandy, pack in a percolator, pour on boiling hot water until 32 fluid ounces of percolate are obtained, and in this dissolve the sugar by agitation."

Pages 181 and 182 of the same manual disclose several formulae comprising coffee extracted with alcohol and water.

The patent to Meyer is for a mixture of powdered coffee beans and oil. The mixture is put up in capsules. The patent states: " * * * The black coffee produces a depressing effect counteracting that of the liquor, and the oil prevents the spirit from rising to the head. * * *"

Page 196 of the Beasley publication states: *"Roasted Coffee* is exhilarant and antisoporific; and is used to counteract the effects of opium, alcohol, and other narcotic poisons. It is best prepared by percolation, with from 1 to 2 ounces of ground coffee to a pint of boiling water. * * *"

Appellant's specification contains the following statement: "I prefer to work with the fresh hot extract that has been brought to the desired temperature to produce the proper combination, say to a temperature of between 140° degrees Fahrenheit and say 165 deg. F., but no ill effect results if the temperature is carried up to and slightly above 173 degrees Fahrenheit, more or less, *which is at or near the boiling point of grain and fruit alcohols and the ethyl alcohol of the U. S. Pharmacopeia.* To this hot coffee extract, and delivered through a tube under the surface of the said extract, I gradually add a quantity of Cognac, or other like brandy, in a proportion to the strength of the coffee extract used, as I find the neutralizing of the intoxicating qualities of the different percentages of alcohol, in the final compound or admix-

ture to which my preparation may be combined, as well as in the preparation itself, depends upon the strength of the coffee extract. I find a weak coffee extract will take up and act upon a smaller percentage of alcohol, while a stronger coffee extract will change and fix the larger percentage of alcohol into the non-intoxicating variety. When all the Cognac has been added and stirred thoroughly, I prefer to then cook at an maintained elevated temperature, in a closed vessel, for a period of from one-quarter to one-half hour, before cooling the mixture (which has now made new combinations or changes within the mass) to a point where it can be put into glass bottles and sealed while still hot, and thereafter further and finally cooled for subsequent storage, shipment and use." (Italics ours.)

The specification further states: "It is the cooking together of these heated solutions which produces new results that are exact and uniform in action, depending upon the strength of the ingredients used. It is my belief that certain exploded starches and proteins in the extracts, at the critical temperature of the cooking, combine with both the coffee and the alcohol, and a gas, which is deleterious, is released and should be removed. This makes a new chain of chemical combinations, not fully known at this time, but which have the power of releasing intoxicating lethal gases from the alcohol mixture, combining perhaps with an exclusion of the excess of hydrogen, which excess of hydrogen in straight alcohol, without my invention, introduces an excess of hydrogen into the blood, and this causes intoxication. Or, it may be, that by the use of my process a release of ethylene gas is brought about, and the ethylene being no longer present to be taken into the blood or stomach, the cause of intoxication is eliminated."

We would observe at this point that it would appear that the precise character of the gases claimed to be released could be easily determined by chemical analysis, especially as it is stated in the specification that the gas released is very poisonous and that the by-product thus secured will be found of market value as an insecticide. There is nothing in the specification which enlightens us upon this point, and it will be observed that the claims recite that the gas thrown off is "the deleterious portion of alcohol." What is the deleterious portion of alcohol is a question upon which there is a wide divergence of opinion. Many people believe that all portions of alcohol are deleterious; others believe that, taken in moderate quantities, none are.

The examiner declined to accept appellant's theory, and held that the removal of the gaseous substance is not patentably material and its omission from the Collingridge process does not avoid his patent as a reference. He further held that the heating process shown in Formula III of the Manual of Beverages, hereinbefore quoted, is equivalent to appellant's cooking step.

The Board of Appeals affirmed these conclusions of the examiner, and we find no error in its decision.

We think the process shown in said Formula III of the Manual of Beverages is equivalent to appellant's cooking process, especially as appellant's specification states that the temperature must be held below 175° F., which, it is stated, "is at or near the boiling point of grain and fruit alcohols and the ethyl alcohol of the U. S. Pharmacopeia."

In said Formula III of the Manual of Beverages boiling water is poured upon the mixture when packed in a percolator, and it seems obvious that, if appellant's so-called cooking process releases poisonous gases from the alcohol, the process set out in said formula would also do so. One of the definitions of the word "cook," as found in Webster's New International Dictionary, is " * * * to prepare or treat (anything) by the action of heat." We regard the sugar in said formula immaterial in so far as the question before us is concerned.

Like the examiner and the Board of Appeals, we are unable to see wherein appellant's process, or composition secured thereby, differs in any patentable respect from the references herein discussed.

For the reasons stated herein, the decision of the Board of Appeals is affirmed.

Affirmed.